GEORGE W. REINE

 VS. No. 7596.

PONTCHARTRAIN R.RD. CO.,
 Appellant.

June 19th, 1919.

CHARLES F. CLAIBORNE, JUDGE.

The plaintiff was walking on a wharf leading to defendant's train; he stumbled, fell, and received injuries for which he sues the defendant in damages.

The plaintiff alleged that on September 12th, 1915 at about 7 or 8 O'clock P. M. on the arrival of the Steamer Hanover at the wharf of the Pontchartrain Railroad Company at Lake Pontchartrain, he was a passenger on the boat; that while walking on the wharf for the purpose of taking defendant's train to come to the City, he met with an unseen obstruction placed in the path of the passengers, was knocked down, and striking on a bench, had his scalp severly cut, from which he suffered great pain for nearly a month and from which he is still suffering; that said wharf was under the care and control of said Railroad Company and that it was through its negligence that said accident happened; that the Railroad Company provided no lights to guide the passengers and that it was by reason of the darkness, which prevented petitioner from seeing the obstruction that he was knocked down; that he was treated at the Charity Hospital from September the 12th. to the 22d; that he estimates his damages at $2500 for the suffering and pain, not including the time lost by him during his treatment; that he is a cotton weigher.

He prayed for $2500 damages.

For answer, the defendant denied any indebtedness; it admitted that the plaintiff was a passenger on the boat and that he fell over an object while walking on the wharf, but denies that said object was unseen, and avers on the contrary that it could and should have been seen by any one exercising proper care,

it denies that said object was an obstruction in the path of passengers and avers that on the contrary it was behind a line of benches and separated thereby from the proper and usual path of passengers which was itself free from obstructions; defendant admits that plaintiff stumbled and fell, but denies that his scalp was cut by striking a bench; and avers that he struck his forehead on the wharf causing only a slight wound; it denied that it had been guilty of any negligence or that the accident happened through its negligence; it denied that it had provided no lights to guide the passengers, but avers that on the contrary they were amply guided by three arc lights which were then burning along the path from the boat to the train, the nearest light being a few feet from the place where the accident occurred; it denied that it was by reason of any darkness due to failure to light the path of passengers that caused the plaintiff to fall; it averred on the contrary that such route was lighted sufficiently well to have enable the plaintiff to avoid the accident by the use of reasonable care which he failed to exercise; it further averred that plaintiff's injury, if he suffered any, was caused by his negligence in taking a route not provided for passengers thereby exposing himself to danger, and in failing to use his eyes to see the obstruction which was easily visible and he was therefore guilty of contributory negligence.

There was judgment for plaintiff for $250 and the defendant has appealed.

The place where the accident occurred is described as follows on a sketch made by F. A. Vienne, master of trains of defendant. The defendant runs a steam railroad from the head of Elysian Fields near the River to Mileneburg on the shore of Lake Pontchartrain; this road is a connecting link to a line of steam-boats running upon Lake Pontchartrain from Milneburg to Mandeville and other points. At the end of the railroad tracks at Milneburg and to reach the boats the Railroad controls a wharf for the use of its passengers; the wharf extends 300 feet over the waters of the Lake and is 22 feet wide; and is covered with a roof along its whole length and breadth; along this wharf are

537

three electric lights, one at the beginning of the wharf near the shore line, another in the centre, and a third at about 25 feet from the extremity of the wharf; along the left hand side going out or West side of the wharf and ten feet from the western edge runs a continuous bench up to about 40 feet of the end of the wharf; the distance between the bench and the western or left edge of the wharf is about ten feet, and the distance between the bench and the right or East side of edge of the wharf is about eleven feet; on the left or Western side of the wharf are two slips used as landings for steamboats; the slip used by the Hanover on the night of this accident is No. 1 and is about 25 feet from the end of the wharf, the other is about 125 feet apart; one of the three lights stands *nearer shore* immediately in front of this slip; and the second 62 feet *inside*; the bench stops at a distance of about ten feet from this slip; the passengers land from the boat over this slip No. 1 and walk *in* upon the wharf to meet the Pontchartrain railroad cars in waiting on shore for the arrival of the boats to take the passengers to the city; as the passengers leave the boat they can walk along one of two routes to reach the train; one on the Eastern side of the benches which we may call the East route, and the other on the West side of the benches which we may call the West route; it is usual and customary for the passengers to walk upon the East route, though there is no direction as to where they shall walk nor any impediment to prevent their walking upon the Western route; nor is there any employee of the railroad to indicate to passengers the route upon the wharf from the boat to the train. Upon the evening of the accident, and for may years prior, there was lying upon the wharf a little to the left or west side of the bench and near the end thereof and about 25 feet from the slip no. 1 an obstruction in the shape of a cattle run about ten feet long and between 3 and 4 feet high, used by the Hanover in unloading stock to the cars over the slip.

The plaintiff testifies that on the night of September 12th, 1915, after seven o'clock, he was coming from Mandeville on the boat Hanover; in walking from the Hanover to the train, the lights on the wharf were not all lit, and he struck himself against

538

an obstruction and fell and hurt his forehead; Mr. Shiell held him by the arm and helped him to the car; when he got off the train he went to the Drug Store; he then want with his son to the hospital to have his wound dressed; it took about one hour; he afterwards went to the hospital for ten days every two days; the wound in his forehead has left a scar; it took about a month to heal; he was among the first passengers to get off of the boat; it was so dark he could not see; there was a light burning where the boat landed and another at the end of the wharf; his accident occurred about 150 feet from the boat; there was no light there; the line of benches was to his right and upon his left was the edge of the wharf; thinks he fell over a stage plank, that was what he saw the day after he went out to look at it; they had pulled it under the bench.

The plaintiff files two photograps of himself taken on September 20 and 29 showing the nature and extent of his injury.

William Shiell was one of the passengers on the Hanover on the night of the accident; he did not see Mr. Reine fall; he was 20 or 30 feet behind him; but he saw the commotion in front; it was very dark; black dark; dark as Egypt; he stated at the time that it was an outrage to land people at such a dark place; that anybody was liable to walk over the wharf; the plaintiff tripped over an abstruction sticking over the wharf; Mr. Reine was being assisted by two men, one on either side, and he told him about his falling on the wharf; he was bleeding; he had a handkerchief over his head; he fell over an obstacle himself; it looked to him like a gang plank sticking out over the wharf; that was about the second slip, nearer to the boat than to the train; the benches were on his right side; he could see better away from the shed than under it; passengers get off near the head of the boat; the lights of the boat do not extend to the head of the boat; they extend about as far as the cabin. The witness here stated that he "would like to say that one of the railroad employees approached him and wanted him to do him a personal favor". The defendant's counsel objected to the statement, in which he was sustained by the Court. We do not see how the interests of the defendant, or the ends of justice, were subserved by the ob-

539

jection or by the ruling.

W. Holmes is a Deputy Sheriff and crier of the Court· of the Judge of the District Court; he was on the boat Hanover on the night of the accident; it was very dark on the wharf as he came out of the boat; he stumbled and fell over the same obstacle as the plaintiff and struck his knee; he did not know the plaintiff until he saw him on the train, and then he was bleeding; the obstacle looked to him like these planks that are put from the car to load up things and unload; he is not sure whether there were two or three; they were put together; the line of benches was on his right; the track was on his left going towards the City; the obstruction was 30 or 50 feet from the boat.

The defendant's witnesses were all its employees. The testimony of these, the Supreme Court has said, must be received with some allowance as their inclination is "to excuse their masters and themselves".Bond vs. Frost, 8 A., 297.

F. A. Vienne was master of trains for defendant for the last 33 years; he made the sketch alluded to in the beginning of this opinion; all the three lights were burning on that night and gave sufficient light to see clearly; there were no obstructions in the way of the passengers on either side of the benches; there was a cattle run about ten feet long and three or four feet high used by the Hanover to unload stock at the slip; it was on the west side of the benches; it has been there for years; and is visible by light No. 1; that run is not in the usual path of passengers; they walk on the east side of the benches; the lights on the boat were burning that night; the Hanover has one thousand electric lights all lighted when it landed on that night; about 150 passengers came off of the boat; he saw the plaintiff after the accident; he did not think he was hurt; he inspected the wharf up and down, on both passage ways, before and after the accident, and saw no obstruction, and the lights on the wharf were burning and also the incandescent lights on the boat.

Dr. Denegre Martin is employed by the railroad company to pass on cases of accidents; examined the plaintiff on May 2d, the scar he saw on plaintiff's forehead could not have been caused by the injury as shown upon the two photographs of plaintiff taken

some days after the accident.

John Roemer is the son of the man employed to turn on the lights on the wharf; his father was sick and he was taking his place on the night of the accident; he turned on the lights that night; he did not get paid by the railroad and does not know whether his father was; he replaced his father during the whole season as his father was sick; he works as a carpenter during winter, and fishes during the summer; when they are not using the gang planks, they generally put them on the west side.

L. Garric is bookkeeper and purser on the Hanover, the wharf was lighted on the night of the accident, and the incandescent lights were burning on the boat; he merely walked out on the slip and went back upon the boat.

M. McCarthy was Garric's assistant on the boat; when the boat landed he went to the head of the slip; the wharf was lighted at the slip; and the incandescent lights were burning on the boat; the only obstruction on the wharf was the gang plank used to unload freight cars; that was on the right hand side of the benches going to the train; the left side is the regular passage way.

Eugene Meunier was steward on the boat; the usual lights were on the wharf.

Colin Baker, conductor of the Pontchartrain Railroad; when the boat came in a little after seven, he went out upon the wharf; the three lights were burning as usual; he walked along the same route the passengers travelled in going from the boat to the train; there was no obstruction on the regular passage way; there were some on the other side of the benches; that was not the regular passage way; after the accident he returned and examined the wharf and saw no obstruction in the regular pathway; the obstructions were upon the west side; the arc lights throw their light on the whole wharf, so that one can read the paper out there;

Q. Did you use any of these gang planks to unload the cars?

A. Only in case they unload stock.

Q. Did you see any gang plank when you went to investigate on the wharf?

A. No, sir; they were out of the way; they were on the side.

Q. Well, how far were these gang planks from the benches?

A. You mean how far were the gang planks from the benches?

Q. Yes. A. On the other side; they are between that railing there and the benches.

Q. How thick are those gang planks? A. About one inch thick.

Q. How long were they? A. About ten feet long.

Q. How many planks in all together? A. There were three, ten feet long, and then there is one about four feet across - three of those.

Q. Now, how many planks of that nature were on the wharf?

A. Just those two cattle guards.

Q. There were only those two cattle guards. A. Yes, sir.

 x x x x x x x x x x x x x

Q. Now, one more question: These planks which I understood you to say you saw on the west side of the line of benches, were they on top of each other, or were they some distance apart?

A. They were laying right together.

Q. On top of each other or side by side? A. They were on top of one another.

There is much confusion in the testimony, and it is difficult to ascertain whether the cattle run was the same as the gang planks. We have reached the conclusion that there were some of both. Mr. Vienne says that the runs were ten feet long and three feet high; he could not have referred to the gang planks which Baker says were one inch thick or high and piled on top of one another; again the runs were used by the Hanover to load cattle, and the gang planks were used by the railroad to unload the cars. While it was natural for the run to be kept on the west side of the benches nearest the boat for use there, it was quite convenient for the gang planks to be thrown upon the east side of the benches nearest the cars to be lifted upon the cars for use there. There is absolutely no force in the defendant's theory that plaintiff was hurt by some obstacle which he encountered while walking upon the west side of the benches, where he had no business to be. Whether he had a right to walk upon that side or not, does not arise, because the plaintiff says he was

proceeding along the right or east side of the benches where
defendant admits it was customary to walk. In this statement
he is corroborated by two witnesses, and there is absolutely no
testimony to the contrary from any witness. But defendant's
witnesses say that they saw no obstruction on the East route
either. Theirs is negative testimony. The positive testimony of
the plaintiff is that the obstacle consisted in a gang plank;
in this he is corroborated by two witnesses who themselves stumb-
led upon the same plank. But the material fact that plaintiff
stumbled and fell speaks more convincingly than the language of
witnesses. The judge of the District Court who saw and heard the
witnesses believed the witnesses for the plaintiff, and we believe
with him.

But the defendant says that there was plenty of light upon
the wharf and that if the plaintiff had used his sense of sight
that he would have seen the obstacle, if any was there. Admitting
that there was such light as three electric lamps throw out, over 300 feet a passen-
ger leaving a boat to reach a train in the midst of a crowd of
100 or 150 passengers looks up and ahead of him - and is not re-
quired to look down for an impediment which he has no reason to
apprehend. But the question of light or no light is itself in
doubt, with the balance in favor of no light. Besides, the moving
crowd cast a shadow upon their feet, and a member of it might not,
under such circumstances, see an impediment which might appear
clearly under other circumstances.

We have therefore come to the conclusion that there was an
obstacle in the regular pathway of the passengers and that it
consisted in a gang plank.

"It is well established in jurisprudence that railway
companies are under the legal obligation to furnish safe
and proper means of ingress and egress to and from trains,
platforms, station approaches, etc., and it is well set-
tled that any person injured, without fault on his part,
by any dereliction of its duty in the premises by a rail-
way company can recover damages against the corporation
for injuries thus received". Peniston vs. RRd., 34 A.,

777 (780); 27 A., 377 (378); 37 A., 707; 144 S. W., 922; 10 C. J., 916 & 1341; 37 N. E., 717.

It made no difference to whom the wharf belonged or who had the control of it. It was the one furnished to passengers by the defendant, and it was its duty to keep it clear of obstructions. 144 S. W., 922; 10 C. J., 912 1337, 1341.

In Brown vs. Ohio Ry., 37 N. E., 717 the defendant was condemned to pay $10,000 damages to an employee of the company who had stumbled upon a plank rising two inches above the floor which the defendant had nailed upon its platform in such a manner as to form an obstruction. Also 53 Barb.629.

Judgment affirmed.
June 19th, 1919.